IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:03-cv-221

| | |
|---|---|
| BESSIE BLANKENSHIP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER AND MEMORANDUM** |
| ) | |
| SPRINT CORP. ) | |
| ) | |
| Defendant. ) | |

On April 24, 2000, Defendant Sprint issued a Notice of Redemption ("Notice") for a certain series of stock held by Plaintiff, Bessie Blankenship. Mrs. Blankenship died on September 24, 2004, in the midst of these proceedings, yet her suit survives her death and continues through her attorney, Malcolm B. Blankenship, Jr., her son and executor of her estate.[1] The plaintiff filed six state law claims in this diversity action asserting that the defendant deceptively redeemed her preferred stock: (1) Fraud; (2) Constructive Fraud; (3) Negligent Misrepresentation; (4) Breach of Fiduciary Duty; (5) Breach of the Implied Covenant of Good Faith and Fair Dealing; and (6) Violation of N.C.Gen.Stat. 75-1.1, the Unfair and Deceptive Trade Practices Act. (Doc. No. 1). Subject-matter jurisdiction is present according to 28 U.S.C. § 1332.

The late Judge Brent McKnight previously granted the defendant's motion to dismiss as to Counts (1), (3), and (6). (Doc. No. 16). Presently before the Court is the defendant's motion for summary judgment on the remaining claims (Doc. No. 27), which is **GRANTED**. The reasons for the Court's decision follow, beginning with the following facts the Court finds to be material and undisputed.

---

[1] The Court will refer to "Malcolm" when it is appropriate to distinguish Malcolm B. Blankenship Jr. from his mother.

1

# I. FINDINGS OF UNDISPUTED FACTS

In April 2000, the plaintiff owned 399 shares of preferred stock issued by United Utilities, predecessor to Defendant Sprint Corporation. On April 24, 2000, the defendant sent the plaintiff a "Notice of Redemption of Sprint Corporation Preferred Stock-Second Series, Convertible." (Doc . No. 31: Plaintiff's Memorandum in Opposition to Summary Judgment).

The plaintiff, who was elderly and legally blind at the pertinent time, lived alone and relied on her son, Malcolm, to read through her mail during his visit every two to four weeks. (Malcolm Dep. 51:22-25). Malcolm testified that he believed his mother opened the Notice upon receiving it and wrote a note on it asking him to look at it. (Id. 51:22-52:4). He is unsure whether she actually read the Notice herself. (Id. 49:22-25). In approximately the third week of May, Malcolm looked at the Notice for the first time. (Id. 55:20-22; 54:14-16). Malcolm "scanned" the Notice, (Id. 52: 3-4, 6-7, 19; 59: 23; 60:1), then "set it aside" (Id. 52:7, 19; 53:7-12; 54:14; 58:15-16). While there were two different customer service telephone numbers provided on the Notice, Malcolm testified that "I don't know that I paid attention in detail to the number until I got ready." (Id. 53: 4-6). A few weeks later in June, Malcolm returned to his mother's house, looked at the Notice for a second time and called the number provided. (Id. 57:13-17). The service representative Malcolm spoke to on the phone informed him of the alternatives contained in the Notice and the pricing differentials. (Id. 57:18-20). It was only as a result of this conversation that he realized he missed the deadline. (Id. 57:22-23). He testified that during his second look at the Notice (before calling the number provided) he did not read it in more detail than he did during his first look at it. It was the information he obtained on the phone that prompted him to undertake a full examination. (Id. 58:5-9).

When asked why the second look at the Notice prompted him to make the phone call, he answered:

A: I guess we move slowly sometimes. Mom had that on the table when I came down and described [it] the first time I looked at it. I put it aside for whatever reason. And I eventually work off my list of things that I do when I go down to visit her, be they a few chores, a few business things. And at that time it was just moved up the list to take action. And maybe that - - I hate to speculate but perhaps that was a weekday or of course this might have been a 24-7 phone

2

number but I did call.

Q: Okay.

A. And if I had gotten no response or if the response had been send it in, we'll redeem it or do whatever we do without any mention of the financial disparities, I probably would have waited another month or so because it's not the top of my agenda. It's hard enough to handle my own affairs.

(Id. 58:13-59:6).

The Notice itself provided that the stock would be redeemed by Sprint on May 25, 2000, at the aggregate amount of $50.375 per share. The Notice also advised the plaintiff of the option to convert each share of preferred stock to 6.18 shares of FON Common Stock and 3.08 shares of PCS Common Stock at any time before the redemption date of May 25, 2000. The Notice advised that after that date, her stock in its current form would no longer be issued and outstanding and that she would retain no rights as a shareholder. The Notice further provided two different Shareholder Relations telephone numbers to call if she had any questions.

The plaintiff does not contest the information provided in the Notice. Rather, Malcolm testified that he did not understand the financial impact of the redemption. "I figured maybe dividents [sic] would stop. In my mind, my mental process based on previous experiences was that accrued income might drop but the right to redeem a bond for instance would continue. But I never experienced anything where a disparity in value would be given up." (Id. 62:10-16; Doc. No. 31: Malcolm Aff. ¶ 6).

The plaintiff contends that the Notice was misleading and deceptive essentially because it failed to adequately disclose the value differential of the two options,[2] thus concealing the need to convert the shares in order to avoid losing value through redemption. On June 19, 2000, Malcolm wrote a letter to the Office of General Counsel of Sprint Corporation demanding recognition of his mother's conversion rights, which Sprint refused to do. As the redemption date had passed, the plaintiff's only recourse was to surrender the stock for

---

[2] The plaintiff originally alleged three reasons for the Notice's misleading and deceptive nature: (1) that the redemption date was the "set-in-stone" deadline by which any conversion had to be made; (2) the Notice failed to adequately disclose the value differential of the two options; and (3) that the Notice, which came from Sprint, applied to her stock, which was originally under the name of United Utilities. The second of these three arguments is the crux of the dispute. The first is not even addressed in her response to the summary judgment motion, and the third is only referred to in passing. The Court finds no merit in the first and third argument, and will focus its analysis on the second one.

redemption on October 2, 2000. The plaintiff suffered a loss of over $100,000.00 resulting from redemption rather than conversion.

## II. SUMMARY JUDGEMENT STANDARD

Summary judgment is appropriate where the Court determines that there is no genuine issue of material fact to be tried and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making that determination, the Court must be certain the record does not reveal any factual disputes, resolving all ambiguities and drawing all permissible factual inferences in a light most favorable to the party against whom summary judgment is sought. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). While the non-moving party is entitled to have conflicting inferences resolved in its favor, those inferences must flow rationally from the underlying facts, and the Court will not consider conclusory allegations, improbable inferences and unsupported speculation. General Mills. Inc. v. Hunt-Wesson, 103 F.3d 978, 980 (Fed. Cir. 1997).

## III. CHOICE-OF-LAW

As a federal court sitting in diversity, this Court applies the law of the North Carolina Supreme Court, Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002), including its choice-of-law rules. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). For actions sounding in tort, North Carolina adheres to the rule of *lex loci delicit*, that is, it applies the law of the state wherein the injury occurred. Boudreau v. Baughman, 368 S.E.2d 849, 853-54 (N.C. 1988). For claims sounding in contract, however, North Carolina adopts the rule of *lex loci contractus*, that is, the law of the place where the contract is made. Fast v. Gulley, 155 S.E.2d 507, 509 (N.C. 1967); see also Tanglewood Land Co., Inc. v. Byrd, 261 S.E.2d 655, 656 (N.C. 1980) ("the interpretation of a contract is governed by the law of the place where the contract was made") and Kohler Co., Inc. v. McIvor, 628 S.E.2d 817 (N.C. Ct. App. 2006) (same).

Here, a significant issue is whether the relationship between a shareholder and corporation, in regards to

redemption of shares, is governed by contract or tort law. While a breach of fiduciary duty is recognized by North Carolina courts as a tort claim, Farndale Company LLC, v. Gibellini, 628 S.E.2d 15, 20 (N.C. Ct. App. 2006), a plaintiff can not allege a tort claim when nothing more than breach of contractual duties is at issue. Spillman v. American Homes, 422 S.E.2d 740, 741-42 (N.C. Ct. App. 1992) ("a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract"); see also Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998) (in applying North Carolina law, the district court erred in allowing plaintiffs to advance tort claims parallel to their breach of contract claims; North Carolina recognizes independent torts arising out of a breach of contract only in "carefully circumscribed" circumstances distinct from the primary breach of contract claim).

North Carolina courts have not spoken directly to the relationship between a shareholder and corporation in regards to redemption of shares. "Thus, it falls to the federal courts to forecast what the North Carolina Supreme Court would hold if presented with this issue." Wilson v. Ford Motor Co., 656 F.2d 960, 960 (4th Cir. 1981).

It is a widely accepted principle that the relationship between a shareholder and corporation is contractual in nature. See 18 Am. Jur. 2d Corporations, §27 (2007) ("In addition to the statute under which a corporation is formed, a corporation's articles of incorporation or the corporate charter and its properly adopted bylaws constitute a binding contract between the corporation and its shareholders or members"); 7A Fletcher Cyclopedia of the Law of Private Corporations, § 3634 (2006) (generally); Matter of Reading Co., 711 F.2d 509, 519 (3rd Cir.1983) ("Under Delaware law the rights of stockholders are contractual. . . ."); Oliver v. Sealaska Corp., 192 F.3d 1220, 1226 (9th Cir. 1999) (holding that the six-year statute of limitation for contract actions governed because under the Alaska statutes, "[t]he relationship between a corporation and its shareholders is primarily contractual"); Middleburg Training Center, Inc. V. Firestone, - - F. Supp. 2d - -, No. 1:07-37, 2007 WL 750219,

5

at *4 (E.D. Va. Mar. 6, 2007) ("when an individual purchases a share of stock in a Virginia corporation, she, in effect, enters into a contract with the corporation"); Burk Ottawa Gas & Electric Co., 123 P. 857, 857 (syllabus), (Kan. 1912) (holding that the corporate bylaws constitute a contract between the preferred stockholders and the corporation which a court of equity will enforce); Toler v. Clark Rural Elec. Co-op. Corp., 512 S.W.2d 25, 27 (Ky. 1974) ("The relationship of a corporation and its shareholders is contractual and the articles and bylaws are part of the contract. The articles and bylaws should be construed as any other contract") (citations omitted); Ericksen v. Winnebago Industries, Inc., 342 F. Supp. 1190, 1193 (D. Minn. 1972) ("[T]he provisions of the contract are to be found in the articles, bylaws or on the [stock] certificates themselves").

This opinion recognizes that North Carolina would regard the shareholder and corporation relationship to be of a contractual nature, and accordingly proceeds with its analysis under the law of the state in which the contract was made, namely Kansas. Gulley, 155 S.E.2d at 509. Alternatively, the Court will undergo an analysis for the breach of fiduciary duty claim according to North Carolina tort law. As the Court finds the plaintiff's claim for breach of fiduciary duty is meritless in either case, it is unnecessary for the Court to resolve definitively whether North Carolina would apply contract or tort law for the resolution of this matter.

## IV. ANALYSIS

### A. The Plaintiff's Fourth and Fifth Claims

1. Contract Analysis for Breach of Fiduciary Duty Claim

The Kansas courts have provided, "[t]he generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to the fact and duration of corporate existence and the rights and liabilities of its officers, stockholders, and directors." Consol. Beef Indus., Inc. v. Schuyler, 716 P. 2d 544, 547 (Kan. 1986); see also Waddell & Reed Financial, Inc., v. Torchmark Corp., 337 F. Supp. 2d 1243, 1250 (D. Kan. 2004) (same).

The Kansas corporation code provides in part, "The stock of any class or series may be made subject to

redemption by the corporation at its option or at the option of the holders of such stock or upon the happening of a specified event." Kansas Statutes Annotated, Chapter 17, Article 6401(b). The statute further specifies that the requirements for a redemption shall be stated in the articles of incorporation or resolutions: "Any stock may be made redeemable under this section may be redeemed for cash, property or rights . . . at such time or times, price or prices, or rate or rates . . . as shall be stated in the articles of incorporation or in the resolution or resolutions . . . adopted by the board of directors. . . ." Id. at 6401(b)(2). Additionally, the statute similarly provides for the corporation's right to convert any class of stock into any other class of stock. Id. at 6401(e).

As permitted by statute, Sprint's Articles of Incorporation provide for the method and requirements of Sprint's redemption of the "Second Series Preferred Stock-Convertible." It is undisputed that the SIXTH ARTICLE, Section 13.8.3, "Conversion Rights," allows shareholders to convert their "Second Series Preferred Stock-Convertible" into a certain number of FON Common Stock and PSC Common Stock.[3] It is undisputed that the same section provides that in the case of redemption, such conversion rights terminate on the day fixed for redemption. It is further undisputed that Section 13.8.5, "Redemption," authorizes Sprint to redeem the Second Series Preferred Stock-Convertible at $50.00 per share plus dividends at any time upon thirty days' notice. Additionally, the plaintiff's stock certificate expressly provides for this redemption price of $50.00 upon thirty days' notice, and further directs the certificate holder to the Articles for a more full and complete statement concerning the stock.

The Notice of Redemption is, without dispute, in accord with the requirements provided by the Articles for a redemption. In accordance with Section 13.8.3, the Notice permitted shareholders to convert each share into 6.18 FON Common Stock and 3.08 PSC Common Stock; in accordance with Section 13.8.5, the Notice provided the Redemption price per share ($50.375 per share) and Redemption Date (May 25, 2000) upon thirty days' notice.

---

[3] The Articles provide for conversion at the rate of 3.09 FON Common Stock and 1.54 PSC Common Stock. The Notice of Redemption provides for conversion at the rate of 6.18 FON Common Stock and 3.08 PSC Common Stock, exactly double of that amount provided in the Articles. While the reason for the discrepancy is unknown, the required conversion rate was met, and therefore need not be discussed further.

The Notice provided additional but unnecessary information, including a statement concerning the loss of rights after the Redemption Date consistent with the Articles,[4] and two different contact phone numbers for "any questions" or "clarifications of the foregoing."

The undisputed facts show that Sprint redeemed the plaintiff's shares in accordance with the express terms of the contract. She received the Notice which informed her of the right to convert prior to the Redemption Date, and gave her notice of the Redemption price if she elected not to convert. She has not pointed to any express provision that was violated, but rather argues for alleged duties in addition to those specified in the contract. As discussed above, contracts between shareholders and corporations are to be construed as any other contract. Therefore, the defendant is entitled to judgment as a matter of law that it did not breach its contract with the plaintiff.

2. Contract Analysis for Breach of Implied Covenant of Good Faith and Fair Dealing

Closely related to what the Court has first considered a breach of contract dispute, the plaintiff also alleged in her Fifth Claim that Sprint breached an implied covenant of good faith and fair dealing.[5] Kansas law, however, does not recognize a separate cause of action for breach of implied duty of good faith and fair dealing apart from a claim for breach of a specific contractual provision. "[I]n order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for 'breach of contract,' not a separate cause of action for 'breach of duty of good faith,' and (2) point to a term in the contract 'which the defendant[] allegedly violated by failing to abide by the good faith spirit of that term." Wayman v. Amoco Oil Co., 923 F. Supp. 1322, 1359 (D. Kan. 1996) citing Pizza Management v. Pizza Hut, 737 F. Supp. 1154, 1184 (D. Kan. 1990).

---

[4] "After the Redemption Date, the Second Series Preferred Stock shall no longer be issued and outstanding, and the holders thereof shall have no rights as shareholders of Sprint (including no right to convert such shares into FON Common Stock and PCS Common Stock), except for the right to receive the cash upon surrender of Second Series Preferred Stock certificates."

[5] In this particular claim, the plaintiff provided, "The relation between a corporation and its stockholders is one of contract in which the charter, articles of incorporation, bylaws, provisions of the stock certificate, and pertinent statutes are embodied." (Complaint ¶ 37). Accordingly, the Court without further explanation will apply Kansas law pursuant to North Carolina's doctrine of *lex loci contractus.* Gully, 155 S.E.2d at 509.

Here, the plaintiff does not bring a separate breach of contract claim and does not point to any term in the contract that was violated. See supra at 9. Accordingly, the Court, as a matter of Kansas law, finds that there is no genuine issue of material fact in dispute as to the plaintiff's Fifth Claim, and the defendant's motion for summary judgment must be granted.

3. Tort Analysis for Breach of Fiduciary Duty

In the alternative, the Court will now analyze the claim for breach of fiduciary duty according to North Carolina tort law. The plaintiff alleges that the Notice was misleading and deceptive in order to "lull shareholders into inaction so that they would miss the conversion deadlines, fewer shares would be converted, and as a result, the value of FON and PCS common stock would increase." (Complaint ¶ 23). It is possible that North Carolina courts would view this allegation within the scope of a negligence action. See e.g., Farndale Company LLC, v. Gibellini, 628 S.E.2d 15, 20 (N.C. Ct. App. 2006) (where individual majority shareholders allegedly issued shares in a manner that squeezed plaintiffs out of the company, the court provided that "[b]reach of fiduciary duty is a species of negligence or professional malpractice") (internal citations omitted). Accordingly, in order for this claim to survive summary judgment, the Court would have to make an inference from the facts, in a light most favorable to the plaintiff, that a reasonable jury could find a fiduciary duty, the duty was breached, and this breach was a proximate cause of injury. Id.

In the instant case, the plaintiff submits essentially three pieces of evidence of the alleged misleading and deceptive nature of the Notice upon which she asks the Court to make its inference. First, the plaintiff submits the Notice itself. The plaintiff argues that the Notice "concealed material information including, without limitation, the value differential of the two options (redemption vs. conversion), the fact that May 25, 2000 was not merely a 'Redemption Date' as stated in the Notice, but was, in fact, a 'set-in-stone deadline' for conversion of Sprint stock," (Complaint ¶ 18), that "[a] reasonable shareholder receiving the Notice who carefully read the title and the first three full paragraphs would have no idea that this Notice required any action on her part," and that "[a]bsolutely no effort was made by Sprint to convey to shareholders that immediate action was required to

9

preserve their conversion rights," (Id. at ¶ 25). Put more simply, the plaintiff is arguing that the Notice was not sufficiently user-friendly. A "comparison of benefits," she argues, would have apparently rendered it so for those who carefully read the title and the first three full paragraphs.

To support this argument, the plaintiff submits the second piece of evidence, namely two examples of security communications filed as attachments to her opposition to summary judgment. As best as the court can glean from its own reading of the two examples, they both provide something that the Notice does not, namely a recent market value of the respective shares. This is intended to demonstrate how a company should communicate with its shareholders pursuant to its fiduciary duties.

The third piece of evidence submitted by the plaintiff is the statistic showing that 39% of all recipients of the Notice did not respond, resulting in the redemption of their stock.[6] (Plaintiff's Memo. at 2). This too is submitted for the purpose of showing that the defendant did not meet its fiduciary duty towards its shareholders.

The above evidence, intended to demonstrate a breach of fiduciary duty, is supported by no case law, statute, or any authority pertaining to fiduciary duties. And while North Carolina has spoken to fiduciary duties in general,[7] the Court finds no authority that delineates such duties within the context of redemption notices. Accordingly, taken in a light most favorable to her, the plaintiff has failed to establish a duty aside from those set forth in the Articles of Incorporation, nor a breach of a duty.

Likewise, the plaintiff has failed to establish causation. Nuwer v. Mariner Post-Acute Network, 332 F.3d 310, 313 (5th Cir. 2003) ("unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment"); Euromotion, Inc. v. BMW of North America, Inc.,

---

[6] The plaintiff's opposition to summary judgment provides that out of 1216 accounts, 699 (58%) elected to convert, 68 (6%) elected to redeem, and 474 (39%) did not respond and were therefore redeemed. The Court notes that the numbers provided by the plaintiff equal 1241, not 1216.

[7] Directors and officers of a corporation must discharge their duties in (1) good faith, (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances, (3) and in a manner they reasonably believe to be in the best interest of the corporation. N.C. Gen. Stat. § 55-8-30(a) and § 55-8-42(a). See also Gibellini, 628 S.E.2d at 19 (defining good faith according to Black's Law dictionary, "a state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage.")

136 F.3d 866, 872-73 (1st Cir. 1998) (a district judge "should not indulge a nonmoving party's inferences if they do not 'flow rationally from the underlying facts'") (internal citations omitted).

The plaintiff's arguments fail because she has not provided any facts upon which any reasonable jury could find the requisite proximate causation of a negligence claim. The oft-cited North Carolina Supreme Court case Ramsbottom v. Atlantic Coast Line R. Co. provided long ago that proximate causation is "a cause that produced the result in continuous sequence, and without which it would not have occurred . . . ." 50 S.E. 448, 449 (N.C. 1905).

Malcolm testifies multiple times that he "scanned" the Notice (Malcolm Dep. 52:3-4, 6-7, 19; 59:23-60:1), then "set it aside" (Id. 52:7, 19; 53: 7; 54:14; 58:15-16).[8] He did not detect the customer service numbers provided: "I don't know that I paid attention in detail to the number until I got ready." (Id 53:4-6). He only realized he missed the deadline after speaking with a representative on the phone. (Id. 57:22-23). In short, he admits he ignored the Notice. When asked why he paid more attention to it during his June visit (after the May 25, 2000 deadline), he answered that they "move slowly sometimes," that he eventually got around to it after working off his list of things to do for his mother, and that the Notice "just moved up the list to take action." (Id. 58:13-20).

The facts as testified to by Malcolm dispel causation. The non-disputed facts establish that Malcolm's "scanning" and "setting aside" of the document would have missed the deadline whether or not a breach occurred. The plaintiff is asking the Court to infer that *if* the Notice included a comparison of benefits, *then* his scanning would have been sufficient to catch the significant aspects of the Notice. However, the plaintiff alleges in her complaint, "[a] reasonable shareholder receiving the Notice who *carefully read* the title and the first three full paragraphs would have no idea that this Notice required any action on her part." (Emphasis added). Since Malcolm stresses the fact that he did not read it carefully, but rather scanned it and set it aside until after the

---

[8] The exact reason he set the Notice aside is unclear. On one occasion Malcolm testifies that he set it aside "for whatever reason" and simply worked off his to do list (Malcolm Dep. 58:15-16), and on another occasion testifies that he set it aside because "based on my experience . . . there seemed to be no penalty from a deadline and there seemed to be no financial consequences." (Id. 53:9-12).

11

deadline, the plaintiff can not establish causation based upon the facts provided, nor upon any inference from those facts taken in a light most favorable to her.

Some jurisdictions have invoked a "reasonable investor" test in determining whether a notice was misleading and deceptive. In Kaplan v. Vornado, Inc., the plaintiff alleged securities violation because the form of a debenture was "deceptive and misleading in that its formal title printed in large prominent letters contains the word 'convertible' but failed to mention the defendant's right to redeem" 341 F. Supp. 212, 214 (N.D. Ill.1971). The plaintiff admitted that he did not thoroughly read the debenture and that he did not know what the terms "redemption" or "callable" meant. The court invoked the "reasonable investor" test and emphasized the requirement of due care on the part of the investor:

> With regard to misrepresentations the question is *whether a reasonable investor*, in light of the facts existing at the time of misrepresentation and *in the exercise of due care, would have been entitled to rely upon the misrepresentation*. With regard to nondisclosures, the issue becomes *whether a reasonable investor*, in light of the facts existing at the time of the nondisclosure and *in the exercise of due care, would have been entitled to receive full disclosure from the party charged and would have acted differently had the alleged nondisclosure not occurred*.

(emphasis in original) Vornado, 341 F. Supp. at 215 (citing City National Bank of Fort Smith, Arkansas v. Vanderboom, 422 F.2d 221, 230 (8th Cir. 1970)). Based upon these standards, the court found in Vornado that the plaintiff failed to meet his own duties as an investor by failing to read the debenture, resting upon his lack of knowledge, and failing to seek guidance on the important terms of the notice. Vornado, 341 F.Supp. at 215-16. See also Morgulas v. Ethyl Corporation, No. 83-9222, 1984 WL 333 (S.D. N.Y. May 8, 1984) (granting summary judgment against a shareholder alleging inadequate notice of redemption; while the court analyzed the issue under contract law it also provided "regardless of the quality of notice given shareholders, the court notes that plaintiff did not act with dispatch" in mailing in her certificate to convert her shares). Under a "reasonable investor" standard, the plaintiff failed to establish causation: a plaintiff cannot prove injury by deception if she (or her agent) does not sufficiently encounter the deception. Accordingly, the plaintiff can not establish the necessary element

of causation in her breach of fiduciary duty claim.

For the reasons stated above, the defendant's summary judgment motion must be granted pursuant to both Kansas contract law and North Carolina tort law. Summary judgment is therefore granted as to her Fourth Claim.

**B.	Constructive Fraud**

In her second count, the plaintiff alleges that "[t]he Sprint Board of Directors took advantage of its position of trust to injure the plaintiff and to benefit Sprint by issuing a misleading and deceptive Notice in order to lull shareholders into inaction so that they would miss the conversion deadline, fewer shares would be converted, and, as a result, the value of FON and PCS common stock would increase." (Complaint at ¶ 23). The Court finds no merit to her arguments.

In North Carolina, the elements of fraud are: "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. Constructive fraud differs from actual fraud in that the intent to deceive is not an essential element." Jordan v. Crew, 482 S.E.2d. 735, 739 (N.C. Ct. App. 1997) (internal citations omitted).

For the reasons set forth above, the plaintiff has failed to show that she (through her son) was deceived by the alleged misleading and deceptive Notice. For the same reasons, namely that Malcolm admits to merely scanning the Notice and setting it aside until after the deadline, the plaintiff can not satisfy the requirement that she was in fact deceived. Therefore, the plaintiff has failed to establish a genuine issue of material fact as to her Constructive Fraud claim, and the Court grants the defendant's motion for summary judgment as to her Second Claim.

## V.  CONCLUSION

After assessing the evidence in light most favorable to the non-moving party, the Court finds that there is no genuine issue of material fact in dispute, and therefore the defendant's motion for summary judgment should be granted as a matter of law.

**IT IS, THEREFORE, ORDERED** that the motion for summary judgment of Defendant Sprint Corp. (Doc. No. 27) be **GRANTED**, and this matter is dismissed with prejudice in its entirety.

Signed: May 9, 2007

Robert J. Conrad, Jr.
Chief United States District Judge